United States District Court
Southern District of Texas
**ENTERED**
August 18, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RENOWNED CHEMICAL            §
SOLUTIONS LLC,               §
                             §
                             §
     Plaintiff,              §
                             §
VS.                          §    CIVIL ACTION NO. 4:21-CV-669
                             §
CJ CHEMICALS LLC, *et al.*,  §
                             §
     Defendants.             §

## **ORDER**

Pending before the Court is the motion to dismiss filed by Defendants CJ Chemicals LLC ("CJC") and Joshua Lee ("Lee") (collectively, "Defendants"). (Doc. No. 40). Plaintiff Renowned Chemical Solutions LLC ("Renowned" or "Plaintiff") has responded in opposition (Doc. No. 43), and Defendants have replied thereto. (Doc. No. 45). After reviewing the relevant briefing and applicable law, the Court **DENIES** Defendants' Motion. (Doc. No. 40).

### I.      Background

This is a breach of contract and fraud case. According to the Second Amended Complaint ("SAC"), Plaintiff Renowned Chemical Solutions is a specialty chemical distributor based in Texas, and Defendant CJ Chemicals is a chemical distributor based in Michigan. (Doc. No. 33 at ¶ 7–8). Defendant Joshua Lee is the CFO and a principal at CJC. (*Id.* at ¶ 9). Renowned's president, Jess Covington ("Covington") allegedly met Lee at an emerging leaders' program and the two developed a social and business relationship. (*Id.* at ¶ 11–12). From January 2020 to February 2021, Renowned and CJC entered into a series of commercial transactions concerning a variety of

chemical compounds. (*Id.* at ¶ 13). Renowned alleges that CJC breached its contractual obligations for four separate transactions, discussed individually below. (*Id.* at ¶ 15–16).

A.  The ISO Loads Contract

In January 2020, Renowned alleges that it ordered "five tanker loads of isopropyl alcohol," inviting CJC to evenly split the profits if it agreed to pay half of the costs. (*Id.* at ¶ 20). CJC allegedly agreed. (*Id.*). The venture proved successful, yielding a net profit of approximately $270,000.00. (*Id.* at ¶ 21). Of the proceeds, however, CJC purportedly received $252,291, whereas Renowned received less than $21,000. (*Id.* at ¶ 22). Renowned contends that CJC owes additional sums in the amount of $119,402.02 pursuant to the agreement between the parties, a fact they claim is supported by Lee's email communications in both September 2020, and February 2021. (*Id.* at ¶¶ 23–25).

B.  Purchase Order J522

In the spring of 2020, Lee allegedly informed Renowned that CJC had a possible sale for a large amount of hand sanitizer, to which Renowned expressed an interest. (*Id.* at ¶¶ 27–28). Defendants allegedly never provided the name of the prospective customer to Renowned; however, Renowned was later informed that Viachem, Ltd. ("Viachem") was negotiating on the prospective customer's behalf. (*Id.* at ¶ 29). Lee and Covington allegedly had several discussions about the possible transaction in which Lee was "adamant" that once CJC submitted a purchase order to Renowned, Renowned was responsible for meeting the delivery timeline in the orders, and if Renowned failed to do so, that CJC would lose the contract with the prospective customer. (*Id.* at ¶ 30). Lee also agreed to provide Renowned with a "substantial deposit" when placing the order for the hand sanitizer. (*Id.*).

In the same discussions, Lee purportedly requested that Renowned take the necessary steps

to prepare for the prospective customer's expected demand, but Covington stated that he would not agree to do so absent a purchase order. (*Id.* at ¶ 31). Lee responded that CJC would not issue a purchase order to Renowned until it had received a purchase order from the prospective client. (*Id.*).

On May 13, 2020, CJC allegedly requested that Renowned execute a non-circumvention agreement stipulating that it "not contact, deal with, negotiate, or participate in any transactions with any of the contracts without first entering a written agreement with the Party who provided such contact unless that Party gives prior written permission," and Renowned agreed to do so. (*Id.* at ¶ 32). A week later, Lee emailed Renowned asking how many jugs of sanitizer Renowned could allocate to the prospective customer and how quickly Renowned could begin delivering 100,000 gallons of sanitizer to the prospective customer per week. (*Id.* at ¶¶ 33–34). On May 22, 2020, Lee allegedly sent a text message to Covington explaining that CJC expected a purchase order from the prospective customer that day. (*Id.* at ¶ 35). The same day, CJC, allegedly via Lee as the only CJC representative involved in the discussions, issued Purchase Order J522 ("POJ522") for 150,000 one-gallon containers of hand sanitizer to be delivered on May 26, 2020, for a total purchase price of $2,175,500. (*Id.* at ¶¶ 36–39).

Due to the quick turnaround, Renowned claims that it had to stop other work to fulfill the purchase order and purchase thousands of labels, containers, and pumps before receiving the deposit from CJC. (*Id.* at ¶¶ 42–44). Renowned also had to negotiate with its packaging vendor to arrange capacity for the order and order thousands of gallons of hand sanitizer from its chemical supplier. (*Id.*). Renowned informed CJC that the hand sanitizer for POJ522 would be ready for pickup on time and that additional gallons were in production to be completed later in the week. (*Id.* at ¶ 47). Covington sent Lee a message requesting the deposit to help cover costs and explained

that Renowned would have to halt production if the money was not delivered as soon as possible. (*Id.* at ¶¶ 48–50). Lee allegedly responded that CJC had not received the money from the prospective customer as of May 27, 2020, and that production should be halted if the money didn't come by the next day. (*Id.* at ¶¶ 51–52).[1]

On May 28, 2020, Lee copied Covington on an email to Viachem, the party negotiating on behalf of the prospective customer, which allegedly indicated that neither Viachem nor the prospective customer had approved Renowned as a vendor for hand sanitizer. (*Id.* at ¶ 54). Renowned, accordingly, was unaware that either the May 26 delivery date was a "fiction" or that CJC did not have a finalized deal with the prospective client and had no way of knowing this due to the non-circumvention agreement. (*Id.* at ¶ 56). Upon learning this information, Renowned instructed its packing vendor to cease work on the order (after having completed nearly 32,000 one-gallon containers) and instructed its chemical supplier to stop production of the hand sanitizer. (*Id.* at ¶ 57).

CJC took delivery of 7,840 containers, while Renowned sold 4,920 gallons of hand sanitizer in an attempt to mitigate damages. (*Id.* at ¶ 60–61). After Renowned cancelled the orders with its vendors, Defendants allegedly provided Renowned with an "advance" of $275,000 due to Renowned's resulting financial situation. (*Id.* at ¶ 64). CJC, however, purportedly failed to pay Renowned the sums due under POJ522, disputes the existence of a binding contract, and has further requested reimbursement or of $275,000.[2] (*Id.* at ¶ 62–63). Renowned remains in possession of the remaining hand sanitizer prepared for the order. (*Id.* at ¶ 75).

---

[1] Renowned alleges that Lee had previously indicated that CJC would pay Renowned an up-front payment for POJ522. (Doc. No. 33 at ¶ 53).

[2] Renowned further alleges that Defendants have refused the approximately $119,000 owed for the ISO Loads because of their claim that they are owed a credit of $275,000. (Doc. No. 33 at ¶ 66). Renowned concludes that the request for credit is a denial that CJC ever had an obligation under POJ522. (*Id.* at ¶ 67).

C.  Purchase Orders BL4938 and BL4939

On May 29, 2020, CJC allegedly issued purchase orders BL4938 and BL4939 to Renowned, each requesting fifty 265 gallon-totes of hand sanitizer gel at $11 per gallon. (*Id.* at ¶ 76–78). Renowned prepared the order, but CJC allegedly has never taken possession or paid for either order. (*Id.* at ¶ 79–80).

## II.      Procedural History

Renowned filed suit against CJC and Lee, bringing breach of contract and promissory estoppel claims against CJC, along with various fraud claims against both Defendants. Defendants subsequently filed the instant motion to dismiss Counts IV and V—fraud and promissory estoppel, respectively—of Renowned's Second Amended Complaint, arguing lack of jurisdiction over Lee, improper venue, and failure to state claims upon which relief can be granted. (Doc. No. 40).

## III.     Legal Standards

A. Lack of Personal Jurisdiction Under Rule 12(b)(2)

When a district court rules on a Rule 12(b)(2) motion without a hearing, the plaintiff must make a prima facie showing of jurisdiction. *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). The court may consider the contents of the record, including affidavits or other recognized methods of discovery, in deciding whether to exercise personal jurisdiction. *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). Generally, the court accepts the plaintiff's non-conclusory, uncontroverted allegations as true and resolves conflicts between the facts contained in the parties' affidavits in the plaintiff's favor. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001).

A federal court may exercise personal jurisdiction over a non-resident defendant if: (1) the long-arm statute of the forum state allows the exercise of personal jurisdiction over the defendant;

and (2) the exercise of personal jurisdiction over that defendant is consistent with Fourteenth Amendment to the United States Constitution. *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 398 (5th Cir. 2009). The two-part jurisdictional inquiry collapses into a single step in this forum because the Texas long-arm statute extends to the limits of federal due process. Tex. Civ. Prac. & Rem. Code § 17.042; *Johnston*, 523 F.3d at 609; *Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). To meet the requirements of due process, the plaintiff must demonstrate: (1) that the non-resident purposely availed himself of the benefits of the forum state by establishing minimum contacts with the state; and (2) that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *Mullins*, 564 F.3d at 398.

"Minimum contacts" can give rise to either specific personal jurisdiction or general personal jurisdiction. *Lewis v. Fresne*, 252 F.3d 352, 358 (5th Cir. 2001). "[A] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Renowned has made no assertion that the Court has general jurisdiction over Defendants.

The court "may exercise 'specific' jurisdiction in a suit arising out of or related to the defendant's contacts with the forum." *Luv N' care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006). The Fifth Circuit has articulated a three-step analysis for specific jurisdiction: "(1) whether the defendant has minimum contacts with the forum state, i.e., whether it purposely directed its activities toward the forum state or purposefully availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) whether the exercise of personal jurisdiction is fair

and reasonable." *McFadin v. Gerber*, 587 F.3d 753, 759 (5th Cir. 2009). The touchstone of the minimum contacts inquiry is whether the defendant's conduct shows that it "reasonably anticipates being haled into court" in the forum state. *Id.*

### B. Improper Venue Under Rule 12(b)(3)

Even if a given forum may exercise personal jurisdiction over the defendant, Rule 12(b)(3) permits a defendant to assert "improper venue" as a defense to a plaintiff's claim for relief. FED. R. CIV. P. 12(b)(3). The general venue statute, 28 U.S.C. § 1391 controls a plaintiff's choice of venue. Under that section, a diversity action may be brought in "(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391 (b)(1)–(2).

"Once a defendant challenges venue, the plaintiff has the burden of demonstrating that the chosen venue is proper." *Graham v. Dyncorp Int'l, Inc.*, 973 F. Supp. 2d 698, 700 (S.D. Tex. 2013) (citing *Am. Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 396 (S.D. Tex. 2011)). "On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (per curiam) (citations omitted). If venue is lacking, district courts are instructed to "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406. "The decision to dismiss or transfer lies within the court's discretion." *Graham*, 973 F. Supp. 2d at 701 (citing *AllChem Performance Prods., Inc. v. Aqualine Warehouse, LLC*, 878 F. Supp. 2d 779, 788 (S.D. Tex. 2012)).

C. Failure to State a Claim Under Rule 12(b)(6)

A defendant may file a motion to dismiss a complaint for "failure to state a claim upon which relief may be granted." FED. R. CIV. P. 12(b)(6). To defeat a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In reviewing a Rule 12(b)(6) motion, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The Court is not bound to accept factual assumptions or legal conclusions as true, and only a complaint that states a plausible claim for relief survives a motion to dismiss. *Iqbal*, 556 U.S. at 678–79. When there are well-pleaded factual allegations, the Court assumes their veracity and then determines whether they plausibly give rise to an entitlement to relief. *Id.*

## IV.    Analysis

As discussed, Defendants bring various arguments in their motion to dismiss. The Court addresses each argument in turn.

A.  The Court Maintains Personal Jurisdiction over Lee

Defendants contend that Renowned has failed to adequately plead personal jurisdiction over Lee, a non-Texas resident. Defendants raise two arguments in support of this point. First, that Lee's Texas contacts derived from his capacity as the CFO of CJC acting in the course and scope of his duties, and thus the fiduciary shield doctrine protects him in his individual capacity from personal jurisdiction in this Court. (Doc. No. 40 at ¶ 12). Defendants note that Renowned raised no allegations of alter ego liability or any reason that the Court should disregard the corporate entity of CJC to raise claims against Lee in his individual capacity. (*Id.* at ¶ 13). Finally, Defendants contend that Lee's alleged contacts with Texas, in the form of "directed e-mails, telephone calls, and text messages to [Renowned] in Texas," are insufficient to give rise to specific personal jurisdiction. (*Id.* at ¶ 14) (citing *Stuart v. Spademan*, 772 F.2d 1185, 1193–94 (5th Cir. 1985)).

In response, Renowned, noting that the claims against Lee are for fraud, argues that Lee's contacts directed to Texas "were intended to cause Renowned to rely on those statements and use much of its resources to manufacture and package a multitude of hand sanitizer." (Doc. No. 43 at ¶ 11). Renowned relies heavily on *Trois v. Apple Tree Auction Ctr., Inc.*, a Fifth Circuit case dealing with a similar factual scenario. *See* 882 F.3d 485, 491 (5th Cir. 2018)

In *Trois*, the Fifth Circuit found that the defendant's president, as a participant on a conference call engaged in conversation about his business, "should have reasonable anticipated being haled into Texas court as a result of reaching out to Texas via phone in order to garner business and make specific representations." *Trois*, 882 F.3d at 491. The *Trois* court, addressing the fiduciary shield doctrine, noted that the doctrine was "inapplicable" because "the fact that "[t]he fact that the court has personal jurisdiction over [the defendant's president] is an issue

separate from his personal liability for the conduct of the corporation, which if relevant, would be more appropriately determined on the merits at a later stage of this litigation." *Id.* at n. 9; *see also Duke Energy Int'l, LLC v. Napoli*, 748 F.Supp.2d 656, 680 (S.D. Tex. 2010) ([T]he fiduciary shield doctrine . . . does not prohibit [the defendant] from being held personally liable for his own tortious conduct simply because he is an officer of a corporation.").

The Court finds the *Trois* case to be instructive in this instance. Like the defendant's president in *Trois*, Lee's alleged contacts are of the sort in which he should have reasonably anticipated being "haled into Texas court" as a result of reaching out to Texas to make specific, business-related representations. The Court finds that personal jurisdiction over Lee is appropriate and denies Defendants' Motion on this point.

### B. Venue is Proper in this Court

Defendants argue that venue is improper in this Court because Renowned does not allege that Lee ever physically entered Texas. (Doc. No. 40 at ¶ 18). Instead, Defendant notes that all of Lee's communications with Renowned occurred while he was in Michigan, and that because all of Lee's alleged actions occurred outside of Texas, the case should either be dismissed for improper venue or alternatively, be transferred to the Western District of Michigan. (*Id.* at ¶ 18–20).

Renowned contends that venue is proper in this Court, citing to 28 U.S.C. § 1391(b)(2), which provides that a civil action may be brought in "a judicial district in which a substantial part of the events or omissions giving rise to a claim occurred, or a substantial part of the property that is the subject of the action is situated." (Doc. No. 43 at ¶¶ 16–17). Renowned again points to *Trois*, which held that venue was proper in Texas because "although a substantial part of the events giving rise to the breach-of-contract claim—contract execution and defendants' performance—took place

in Ohio, a substantial part of the events giving rise to the fraud claim—the misrepresentations—took place in a business call to Texas." *Trois*, 882 F.3d at 493–94. Since the alleged misrepresentations occurred via intentionally made business communications to Texas, Renowned contends that venue is proper. (Doc. No. 43 at ¶ 19) (citing *Pierce v. Aircraft Fin. Corp. LLC*, 512 F. Supp. 3d 753, 765 (S.D. Tex. 2021)).

The Court finds that *Trois* controls and thus venue is proper here. Like in *Trois*, Lee's alleged misrepresentations—the basis of the fraud claims in Count IV—were made to Renowned while Renowned was in Texas. Clearly, then, a substantial part of the events giving rise to the fraud claim occurred in Texas. Defendants' Motion is denied as to improper venue.

C. <u>Failure to State a Claim</u>

Next, Defendants contend that Renowned's four iterations of Count IV—encompassing both common-law fraud and fraud by nondisclosure—fail to plausibly allege the elements of fraud with the particularity required by Federal Rules of Civil Procedure 9(b) and 12(b)(6). (Doc. No. 40 at ¶ 21). Defendants further contend that Count IV is barred by the economic-loss rule.

*1. Count IV Allegations of Fraud*

The Court will first address the arguments concerning fraud. The elements of common-law fraud are:

> (1) The defendant made a material representation that was false; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff actually and justifiably relied upon the representation and suffered injury as a result.

*JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018) (cleaned up). The elements of fraud by non-disclosure are:

> (1) The defendant failed to disclose facts to the plaintiff when the defendant had a duty to disclose such facts; (2) the facts were material; (3) the defendant knew of

11

the facts; (4) the defendant knew that the plaintiff was ignorant of the facts and did not have an equal opportunity to discover the truth; (5) the defendant was deliberately silent and failed to disclose the facts with the intent to induce the plaintiff to take some action; and (6) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed facts. Plaintiff must also show that he relied on the omission or concealment.

*Stolts v. Wells Fargo Bank, NA*, 31 F. Supp. 3d 876, 883 (S.D. Tex. 2014) (cleaned up). Reliance on a fraudulent misrepresentation is inappropriate if a party either knows that it is false or if there are "red flags" suggesting that the representation may be unreliable *Id.*

Defendants argue that Renowned has not plausibly alleged a material misrepresentation concerning immediate payment because POJ522 has a "NET 30" payment term, allegedly making clear that no obligation of payment occurred until thirty days after receipt of invoice. (Doc. No. 40 at ¶ 27). Defendants next contend that Renowned has not alleged a failure to disclose material facts, noting that whether or not CJC had a committed customer at the time POJ522 was issued is immaterial, and that the delivery date of May 26 was not a deadline because the invoice noting a NET 30 payment term, rather than POJ522, set forth the timeline for performance. (*Id.* at ¶ 28).

Defendants similarly argue that Renowned could not have relied on any misrepresented "promise of payment" or the delivery date in POJ522 because it specifies a NET 30 payment term. (*Id.* at ¶ 29). Regardless of Lee's alleged communications concerning when the payment would arise, Defendants contend that POJ522's "unambiguous" NET 30 payment term constituted a "red flag" as to when payment would be due, and thus any reliance was unjustified. (*Id.* at ¶ 30–31).

With respect to the pleading of false, material misrepresentations, Renowned alleged in the SAC that Lee made a series of misrepresentations concerning POJ522, including that CJC had a customer confirmed for the order and that POJ522—which, according to Lee, allegedly could not be issued without a customer commitment—served as the triggering event for the May 26, 2020,

delivery date. (Doc. No. 43 at ¶ 26) (citing Doc. No. 30 at ¶¶ 30–31). At this stage, the Court finds that Renowned has sufficiently pleaded a material misrepresentation.

As to reliance, Renowned contends that it relied on Lee's assurances of CJC's ability to pay prior to beginning production to fill POJ522. (Doc. No. 43 at ¶¶ 32–33) (citing Doc. No. 30 at ¶ 43). Renowned agrees that May 26, 2020, was not the deadline for delivery of the entire purchase order but argues that it was the date on which CJC would begin accepting deliveries for the order. (Doc. No. 43 at ¶ 35). Furthermore, Renowned pleaded that had it known that CJC did not have a customer commitment at the time POJ522 was issued, it would not have accepted the contract nor started on production. (*Id.* at ¶ 37). Instead, because of Lee's alleged misrepresentations, Renowned spent several hours and thousands of dollars to begin delivery on May 26, 2020. Taken in the light most favorable to Renowned, the Court finds that Renowned has sufficiently pleaded reliance to support its fraud claims. Defendants' Motion is denied on this point.

### 2. *Economic Loss Rule Does Not Bar Fraud Claims*

Despite Renowned having successfully pleaded fraud, Defendants contend that Count IV should be dismissed due to the economic loss rule. "In Texas, the economic loss rule 'restricts contracting parties to contractual remedies for those economic losses associated with the relationship, even when the breach might reasonably be viewed as a consequence of a contracting party's negligence.'" *Dick v. Colo. Hous. Enters.*, 780 F. App'x. 121, 125–26 (5th Cir. 2019) (per curiam) (unpublished) (quoting *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 12–13 (Tex. 2007)).

Defendants contend that each sub-count of Count IV is barred by the economic loss rule because all damages are both economic in nature and based solely on breaches of duty created by the alleged contract at issue. (Doc. No. 40 at ¶¶ 35–41). Renowned, however, argues that it has

pleaded fraud in the alternative to its breach of contract claims, so the economic loss rule should not apply to the fraud claims at this stage. (Doc. No. 43 at ¶ 40). Renowned points to Defendants' Answer, in which Defendants deny the existence of a contractual relationship with Renowned, as justification for the alternative pleading. (Doc. No. 9 at ¶¶ 32–35). Renowned additionally argues that Lee had a duty not to make material misrepresentations independent of the alleged contractual duties, owing to a "relationship of trust and confidence." (Doc. No. 43 at ¶ 42).

Since there is a dispute as to whether a contract exists between the parties, the Court finds that Renowned's pleading of alternative theories is appropriate and finds that at this stage, the economic loss rule does not bar Renowned's fraud claims. *See Fowler v. U.S. Bank, Nat. Ass'n*, 2 F. Supp. 3d 965, 979–80 (S.D. Tex. 2014). As Renowned notes, if at a later stage it is determined that a contract did exist between the parties, Renowned's fraud claims would become subject to the economic loss rule. (Doc. No. 43 at ¶ 43). Defendants' Motion as it concerns the economic loss rule is denied.

### 3. *Promissory Estoppel*

Finally, Defendant argues that Renowned's claim for promissory estoppel must fail because Renowned fails to sufficiently allege reliance on the purported promise to its detriment, and because of the express contract doctrine. (Doc. No. 40 at ¶¶ 46, 50). "The requisites of promissory estoppel are: (1) a promise, (2) foreseeability of reliance thereon by the promisor, and (3) substantial reliance by the promise to his detriment." *English v. Fischer*, 660 S.W.3d 521, 524 (Tex. 1983). Defendant argues that Renowned's only detriment was caused by "substantial price drops" occurring after purchasing materials to fulfill POJ522, not its reliance on CJC's promise, so promissory estoppel fails. (Doc. No. 40 at ¶¶ 47–50) (citing *Preston Exploration Co. v.*

*Chesapeake Energy Corp.*, No. H-08-3341, 2009 WL 6443108, at *4 (S.D. Tex. Nov. 3, 2009) (explaining that unfavorable market changes are always a risk for contracting parties)).

Renowned argues that its detriment was not merely due to market changes, but also the money spent to acquire the necessary products to fill POJ522. (Doc. No. 43 at ¶ 46).

Defendant additionally contends that the express contract doctrine. (Doc. No. 40 at ¶ 50). "The existence of a valid, express contract that covers the subject matter of the parties' dispute generally precludes recovery under a quasi-contract theory." *Williams v. Colonial Bank, N.A.*, 199 F. App'x 399, 403 (5th Cir. 2006) (unpublished). In support of this argument, Defendants cite *Hamilton v. Mike Bloomberg 2020, Inc.*, No. 4:20-cv-00488, 2021 WL 1966843, at *5 (N.D. Tex. May 17, 2021). In *Hamilton*, however, the parties agreed that a valid contract existed between the parties. *Id.* There is no such agreement here. As earlier discussed, there is a dispute as to whether a valid contract existed between the parties. Therefore, the Court finds that Renowned has sufficiently pleaded a claim of promissory estoppel. Defendants' Motion is denied on this claim.

## V.   Conclusion

For the reasons stated above, Defendants' Motion to Dismiss Counts IV and V is **DENIED**.

Signed at Houston, Texas, this _17th_ day of August, 2022.

Andrew S. Hanen
United States District Judge

15